Filed 7/29/26  P. v. Sanford CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANDREW EVAN SANFORD,<br><br>    Defendant and Appellant. | C102345<br><br>(Super. Ct. No. P12CRF0180) |

Defendant Andrew Evan Sanford appeals the trial court's denial of his petition for resentencing under Penal Code section 1172.6 after the trial court issued an order to show cause.[1]  His appellate counsel filed a brief raising no arguable issues under *People v. Delgadillo* (2022) 14 Cal.5th 216 (*Delgadillo*) and asked that we exercise our discretion to review the record for arguable issues on appeal.

---

[1] Undesignated statutory references are to the Penal Code.  Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6.  (Stats. 2022, ch. 58, § 10.)  There were no substantive changes to the statute.  Defendant filed his original petition under former section 1170.95, but we will cite to the current section number throughout this opinion.

1

This court notified defendant he had 30 days to file supplemental briefing raising any argument he wanted us to consider. Defendant filed a supplemental brief raising numerous contentions.[2] We have independently reviewed the contentions defendant raises in his supplemental brief in accordance with *Delgadillo* and conclude none of them have merit. We will affirm.

## I.   BACKGROUND

Just as the trial court did in reviewing defendant's section 1172.6 petition, we derive our statement of facts from the evidence admitted during the 2015 trial.

### A.   *The Murder and Initial Investigation*

On August 14, 1980, the 16-year-old victim was working at a gas station from midnight to 8:00 a.m. A co-worker saw him at the station at around 2:00 a.m., and a customer paid an attendant at around 5:00 a.m. At around 6:00 a.m., another man saw two neatly-dressed white males in their early 20s come out of the gas station's office and then go back inside; he left about five minutes later. About 10 to 15 minutes after that, a different customer found no attendant when he tried to pay for gas.

Later that morning, the victim was found dead in the gas station's office. The victim's face, hands, and midsection were bound with duct tape, with his head taped all

---

[2] Defendant also seeks judicial notice of several documents, including some that are already in the record and others that are not. We deny judicial notice of these materials. (See Cal. Rules of Court, rule 8.252(a)(2)(B)-(C) [party seeking judicial notice must file a motion stating "[w]hether the matter to be noticed was presented to the trial court and, if so, whether judicial notice was taken by that court;" and "[i]f judicial notice of the matter was not taken by the trial court, why the matter is subject to judicial notice under Evidence Code section 451, 452, or 453"].) To the extent the request seeks judicial notice of material unrelated to the issues on appeal, judicial notice is also denied based on relevance grounds. (*City of Hesperia v. Lake Arrowhead Community Services Dist.* (2023) 93 Cal.App.5th 489, 509 [appellate court may decline to take judicial notice of matters not relevant to dispositive issues on appeal].)

the way around from his lower chin up to just below his eyes.  There were bandages on two of the victim's fingers.

The office was in "disarray" with "quite a bit of blood" on the floor.  The cash register in the cashier booth was open, and about $760 was missing from the gas station.

In the gas station's compressor room, which was adjacent to the office, a roll of grey duct tape was on top of a first aid kit.  On the floor there were also wood chips, bloodstains, shoe prints, and a blood-stained roll of towels.

The duct tape was removed from the victim at the mortuary and collected as evidence.  Before removing the tape from the victim's mouth and nose, the investigating officer unsuccessfully tried to recover fingerprints.

The autopsy revealed that the victim died of asphyxiation due to suffocation.  He also had non-fatal lacerations on his scalp and near his eye.  Based on the victim's condition, the examining physician opined that the victim had been alive when the duct tape was put on his face.  Assuming the tape blocked the victim's nose and mouth, it would have taken about three to four minutes for the victim to suffocate to death.

B.       *Circumstances Surrounding the Murder*

Donald also worked at the gas station during the summer of 1980.  The night of the murder, he worked the shift right before the victim's.  The day after the murder, Donald told an interviewing police officer that, prior to leaving his shift, he cleaned up the lube room and put a roll of duct tape in the cabinet in the gas station's lube area.

Donald and his twin brother, Ronald, knew defendant from high school. Unemployed at the time, defendant would occasionally stop by the gas station to borrow money or gasoline.  Defendant also sometimes helped Donald work on Donald's car at the gas station.  At one point, defendant needed a place to live and stayed temporarily with Donald's grandparents.  The grandparents kicked defendant out when they suspected him of stealing a truck from their business.

3

Timothy was also friendly with defendant the summer of the murder.  He last saw defendant a week before the murder.  Defendant came to his house and invited him to go "jockey boxing," which meant stealing things out of cars.

Peggy knew defendant at the time of the murder.  When interviewed by police in 1980, she said that, the day of or the day before the murder, she was in a parking lot near the gas station.  She noticed defendant, who was bigger than her, sitting in her parked car.  Fearing he was about to steal it, she ran toward her car.  Defendant got out of her car, grabbed her, and asked for money.  She refused, explaining she only had two dollars.  Defendant "started getting crazy," and said " '[W]hat about the station?  What about the Shell station?' "  It seemed like defendant "had to rush over there."

C.      *Admissions to Jenna in 2010*

Jenna dated defendant in 2010 and briefly lived with him.  Soon after she moved in, defendant asked her if she thought God forgave murders.  When Jenna responded "yes," defendant explained that, when he was younger, he and some friends "did something," and he thought "somebody might have died."  Jenna let the statement go because she needed a place to live.

D.      *2010-2011 DNA Analysis*

In 2010, a Department of Justice criminalist began analyzing the evidence for DNA.  The criminalist was able to exclude defendant as a contributor to the DNA found on the duct tape from the victim's midsection, and only the victim's DNA was on the tape from the victim's head.  However, the DNA from the side of the duct tape roll contained a mixture of DNA from the victim and a second contributor, and defendant could not be ruled out as the second contributor.  In addition, defendant could not be ruled out as a second contributor to the DNA found on the tape from the victim's wrists and hands.  The chance that a random unrelated individual would be included as a possible contributor to a DNA mixture was one in 240 million for African Americans,

4

one in a hundred million for Caucasians, and one in 67 million for Hispanics. Still, the criminalist acknowledged, it was impossible to know when the DNA was deposited.

E.    *Defense*

Defendant argued the murder investigation had been mishandled, and evidence had been destroyed or contaminated. According to defendant, his DNA was at the scene because he worked in the gas station garage and handled tools while working on Donald's car, and Jenna was simply not reliable.

F.    *Charges, Verdicts, and Sentencing*

In 2014, defendant was charged with murder.[3] (§ 187.) The information also alleged: (1) the murder was premeditated and occurred in the perpetration of, or attempt to perpetuate, a robbery and a burglary; and (2) the special circumstances that the murder was committed while defendant was engaged in a robbery and in a burglary. (§§ 189, 190.2, subd. (a)(17)(A), (G).)

The jury found defendant guilty of first degree murder and found both special circumstance allegations true. The trial court sentenced defendant to life without the possibility of parole. On appeal, this court affirmed the judgment. (*People v. Sanford* (Dec. 4, 2020, C078614) [nonpub. opn.].)[4]

G.    *Section 1172.6 Petition and Hearing*

In 2022, defendant filed a petition for recall and resentencing under section 1172.6. The trial court appointed counsel, ordered briefing, and subsequently issued an order to show cause.

---

[3] The original complaint was filed in 2012.

[4] We take judicial notice of this court's prior opinion in case No. C078614. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

During the evidentiary hearing, the trial court noted that it had considered the parties' briefing and the trial transcripts, including the jury instructions, jury verdicts, and findings. Defendant argued that, since the case was tried in 2014, the People now had to prove beyond a reasonable doubt that defendant was a substantial participant under the new definition. The People argued the new standard was met, since defendant's DNA was found on the tape used to bind the victim, that defendant acted suspiciously before the murder and appeared to want to rob the gas station, and that defendant had acknowledged guilt to Jenna.

The DOJ criminalist who originally performed the 2010 and 2011 DNA analysis acknowledged that there was one swab from the duct tape roll that might have had a third DNA contributor. Some other pieces of tape had three to four DNA contributors.

A forensic DNA consultant expressed concern that the original crime scene technician's collection of evidence "could have led to transfer of DNA," especially since the technician handled multiple and different items of evidence while wearing the same gloves. Touching items with the same gloves can lead to DNA transfer, including when moving the victim's body. She opined it was possible that the DNA from the side of the roll of tape was transferred to the sticky side of the tape. It was also possible that defendant's DNA would have been present in the gas station's garage simply because he had been there working on Donald's car before the murder. The consultant was also concerned that, even though defendant had been excluded from some samples of the tape, there had been no testing to determine the identity of the other contributors.

H.     *Trial Court's Denial of Defendant's Section 1172.6 Petition*

Citing *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*), the trial court found that where, as here, a jury made felony murder special circumstance findings before *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), those findings cannot be used to determine that a defendant is ineligible for resentencing

6

under section 1172.6. The trial court then made several findings under *Banks* and *Clark* as follows:

Turning to the *Banks* factors, the trial court found that defendant had a role in planning the crime that led to the victim's death because there was no evidence that anyone else was involved in planning the burglary of the gas station. In addition, Peggy's statements to police established that, when defendant failed to get money from her, he started asking about the gas station.

As to supplying the lethal weapon, the autopsy showed that the cause of death was asphyxiation due to the tape over the victim's nose and mouth. It was impossible to exclude the defendant as a contributor to the DNA on the duct tape binding the victim, and the likelihood of this being a false positive was miniscule. Although there had been evidence that defendant worked on Donald's car in the gas station's garage, no one testified that they had ever seen him using or handling duct tape at the gas station, making it likely that defendant handled the tape during the murder.

The evidence also indicated that defendant was aware of the danger posed by the nature of the crime or the weapons used. The tape had been wrapped around the victim's nose and mouth in such a way that it "completely seal[ed] off his nose and mouth." It would have been "obvious that he would be unable to breathe and he would suffocate."

As to defendant's past experience with other participants, the evidence was unclear as to whether there were other participants, or who they were. Someone saw two men leaving the gas station office at around 6:00 a.m., but it was unclear if they had any connection to the crime.

Regarding whether defendant was present at the scene of the killing or in a position to prevent the killing, the defendant could not be excluded as a contributor to the DNA found on the tape that bound the victim. This strongly suggested he was present and bound the victim. Even if defendant was not the sole participant in the crime, he was

7

in a position to either prevent a co-participant from taping over the victim's nose and mouth, or to remove the tape and prevent the victim's suffocation.

It was unclear what defendant did after the lethal force was used. However, defendant did not remove the tape from the victim's nose or mouth.

Turning to the *Clark* factors, the trial court noted that, as to the lethal weapon, there was DNA evidence indicating defendant bound the victim. A jury could reasonably infer that defendant also wrapped the victim's head and face with duct tape. Regarding physical presence at the crime and opportunities to restrain the crime or aid the victim, the court again noted that the DNA evidence indicated defendant was present and either bound the victim or failed to help the victim by removing the duct tape. With respect to the duration of the felony, it must have taken a long time to restrain the victim and then carefully bind his face and head.

As to defendant's knowledge of any co-participant's likelihood of killing, it was unclear that there were other participants, or who they were. Defendant's statements to Jenna that, when he was young, he and some friends might have done something to someone did not "credibl[y]" establish that other people were involved.

Regarding defendant's efforts to minimize the risk of violence during the felony, nothing in the record suggested defendant "did anything" to minimize the risk of violence during the crime. Even if defendant only restrained the victim, that "significantly" increased the risk of harm because it prevented the victim from defending himself.

The court stated that defendant had presented "nothing new" during the hearing, especially as to defendant's efforts to discredit the DNA evidence. Instead, the evidence established "beyond a reasonable doubt" that either defendant was the actual killer, or that, under *Banks/Clark*, defendant was a major participant and acted in reckless indifference to human life. As such, defendant was ineligible for relief under section 1172.6.

Defendant timely appealed.

8

## II.   DISCUSSION

Despite defendant's apparent request for an independent review of the record, we need only evaluate the specific arguments presented in his supplemental brief. (*Delgadillo*, *supra*, 14 Cal.5th at pp. 231-232.)

### A.   Sufficient Evidence Supports the Trial Court's Denial of Relief

#### 1.   Legal Background: Senate Bill 1437

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) amended the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  Senate Bill 1437 achieved these goals by amending section 188 to require that a principal act with express or implied malice (§ 188, as amended by Stats. 2018, ch. 1015, § 2), and by amending section 189 to state that a person can be liable for felony murder only if:  (1) the "person was the actual killer;" (2) the person, with an intent to kill, was an aider or abettor in the commission of murder in the first degree; or (3) the "person was a major participant in the underlying felony and acted with reckless indifference to human life."  (§ 189, subd. (e), as amended by Stats. 2018, ch. 1015, § 3.)

Where, like here, the trial court issues an order to show cause and holds an evidentiary hearing, the prosecution bears the burden of proving, beyond a reasonable doubt, that the petitioner is guilty of murder under California law as amended by the changes to section 188 or 189 made effective by Senate Bill 1437.  (§ 1172.6, subd. (d)(3).)  The parties may offer evidence from a prior trial, or new or additional evidence at the hearing.  (*Ibid.*)

We review the denial of a section 1172.6 petition following an evidentiary hearing for substantial evidence.  (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125.)  "Our job on review is different from the trial judge's job in deciding the petition.  While the

trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) We examine " 'the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658.) "We do not reweigh the evidence or revisit credibility issues, but rather presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence." (*People v. Pham* (2009) 180 Cal.App.4th 919, 924-925.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

2.    *Legal Background:* Banks/Clarks *Factors*

When "Senate Bill 1437 amended … section 189 to incorporate major participation and reckless indifference requirements, it codified the understanding of those requirements elucidated in *Banks* and *Clark*." (*Strong, supra*, 13 Cal.5th at p. 710.) Although technically courts have stated separately the major participation and reckless indifference requirements, " 'they often overlap' " and cannot be uncoupled. (*Clark, supra*, 63 Cal.4th. at p. 615.) Generally, " 'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Ibid.*) Accordingly, evidence of major participation " 'often provide[s] significant support' " of reckless indifference. (*Ibid.*)

*Banks* considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." (*Banks, supra*, 61 Cal.4th at p. 794.) The

10

high court identified various factors that should be considered in making the determination, including: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

The *Banks* court recognized that "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks, supra*, 61 Cal.4th at p. 803.) Instead, all of the factors "may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Ibid*.)

Applying these factors, the *Banks* court found the evidence was insufficient to show the defendant there—a getaway driver for an armed robbery of a medical marijuana dispensary—was a major participant, where there was no evidence establishing his role in planning the robbery or procuring weapons, and no evidence he was present for the robbery or could have done anything to stop the shooting or render assistance. (*Banks, supra*, 61 Cal.4th at pp. 794-795, 804-805, 807.)

Our Supreme Court considered the "reckless indifference" element in *Clark*. (*Clark, supra*, 63 Cal.4th at pp. 614-623.) Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Id.* at p. 616.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) Recklessness has both a subjective and an objective component. (*Ibid.*) Subjectively, the defendant must consciously

11

disregard risks known to him. (*Ibid.*) Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether the defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Ibid.*) The fact that a robbery carried a risk of death is insufficient, by itself, to support a finding of reckless indifference. (*Id.* at pp. 617-618.)

Similar to *Banks*, the *Clark* court identified various factors to be considered in determining whether the defendant acted with reckless indifference. (*Clark, supra*, 63 Cal.4th at pp. 618-623; see also *In re Scoggins* (2020) 9 Cal.5th 667, 677 [courts must analyze the "totality of the circumstances" when considering reckless indifference].) These include: "Did the defendant use or know that a [lethal weapon] would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins, supra*, at p. 677 [listing factors set forth in *Clark, supra*, at pp. 618-623].) As courts have explained, youth may also be a relevant factor in considering reckless indifference. (*People v. Keel* (2022) 84 Cal.App.5th 546, 558-559.)

Applying these factors, the *Clark* court found the evidence was insufficient to show the defendant acted with reckless indifference to human life in the armed robbery of a computer store, where he planned the robbery but was not armed or physically present in the store when the victim was shot, did not have the intent to kill, and attempted to minimize the likelihood of violence by timing the robbery for a time when fewer people would be present and using an unloaded gun. (*Clark, supra*, 63 Cal.4th at pp. 611, 613, 618-623.)

### 3. Analysis

Defendant argues the trial court erred in denying his resentencing petition because there was not substantial evidence to support the trial court's finding that he was a major participant who acted with reckless indifference to human life. We disagree.

As the trial court did, we turn first to the *Banks* factors. Peggy's statement to police that defendant got "crazy" and asked about the gas station when she refused his intimidating requests for money supports the trial court's finding that defendant planned the robbery.[5] In addition, the DNA evidence established, at a minimum, that defendant was present at the scene and helped bind the victim, which prevented the victim from defending himself while tape was bound over his mouth and nose. Defendant must have been aware that closing off the victim's airways would have suffocated him, yet there is no evidence that defendant did anything to stop any compatriots or otherwise help the victim.

Turning to the *Clark* factors, we conclude the record contains sufficient evidence from which the trial court could conclude beyond a reasonable doubt that defendant acted with reckless indifference to the victim's life. We agree with the trial court that it was unclear whether other participants were involved. However, given the DNA evidence, it was reasonable for the trial court to infer that, at a minimum, defendant was present and used the duct tape to bind and restrain the victim, leaving the victim in a very vulnerable position. Defendant appears to have made no efforts to minimize the risk to the victim or render any aid, even though: (1) the victim was alive when the tape was placed over his

---

[5] To the extent defendant challenges the accuracy or reliability of Peggy's statements, Jenna's statements, or the DNA evidence (including based on the differing evidence collection standards in 1980 or chain of custody issues), we note these issues were before the trial court. We decline defendant's invitation to reweigh the credibility of this evidence. (*People v. Pham, supra*, 180 Cal.App.4th at pp. 924-925 [reviewing courts do not reweigh the evidence or revisit credibility issues].)

nose and mouth; and (2) it took about three to four minutes for the victim to suffocate to death.

Accordingly, we conclude from the totality of the evidence and reasonable inferences from the evidence that substantial evidence supports the trial court's findings that defendant was a major participant who acted with reckless indifference to human life.

B.    *Additional Arguments*

Defendant next contends the trial court failed to properly evaluate the entire record, arguing the court did not consider "exculpatory inferences," and "[r]eliability issues were not resolved." Pointing to a one-page list of transcript page cites for the general location of the testimony from each of the 14 witnesses from the preliminary hearing, defendant argues the trial court erred in failing to consider preliminary hearing transcripts. We decline to find error because defendant has failed to explain how this alleged error prejudiced him, especially since defendant's evidentiary hearing briefs never argued that such evidence was relevant. (*People v. Garza* (2005) 35 Cal.4th 866, 881 [on appeal, a judgment of the trial court is presumed correct, and a party attacking the judgment must affirmatively demonstrate prejudicial error].)

For similar reasons, we find meritless defendant's claim that the trial court erred in failing to consider "subpoenaed" evidence, especially since nothing in the record indicates defendant or the prosecution sought to have this new "subpoenaed" evidence (which is not in the record on appeal) admitted during the evidentiary hearing. We also reject defendant's invitation to infer that his attorney was prevented or "hamstrung" from presenting any relevant new evidence such as the "subpoenaed" evidence, given that defendant had the opportunity to submit briefing and oral argument. In addition, because the trial court ultimately scheduled closing argument based on defense counsel's request, we find no merit in defendant's argument that the trial court erred in denying his

14

counsel's request to delay closing argument.**6** (*People v. Garza, supra*, 35 Cal.4th at p. 881 [a party attacking the judgment on appeal must affirmatively demonstrate prejudicial error].)

Defendant next argues the trial court "got the facts wrong," including describing Peggy as saying defendant "demanded money," when (according to defendant) the police report said defendant only asked Peggy to "l[oan] him some money." Although the record on appeal does not contain a copy of this police report, it does contain a copy of excerpts from the transcript of Peggy's actual police interview. The transcript does not use the word "demand," but it does indicate that defendant, who was bigger than Peggy, grabbed her, asked for money, and "was trying to get [her] purse." We find no error in the trial court describing this interaction as defendant demanding money from Peggy.

We similarly find no error in the way the trial court described the stipulation regarding the customer who said he saw two young men walking out of the gas station office at around 6:00 a.m. the day of the murder. We also decline defendant's apparent invitation to assume that the trial court misunderstood the evidence, including the timeline of the various witnesses who stopped by the gas station the day of the murder, or failed to properly consider defendant's age and state of mind at the time of the murder. (See *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1532-1533 [we presume the absence of error from a silent record].)

---

**6** During the evidentiary hearing, both parties said they had presented all their evidence just before lunchtime. Defense counsel asked to delay closing argument until the following morning, explaining he needed more time because there were "some legal arguments that [he] need[ed] to follow up on." The court responded that the law had not changed significantly since defense counsel was appointed, and, if this were a trial, it would "expect closing argument this afternoon." Defense counsel asked to return at 2:30 p.m. The court explained it needed to do other court business, asked how much time each party needed, and then asked defense counsel when he wanted to return. Defense counsel responded, "2:30," and the trial court asked the parties to return at 2:30 p.m.

Additionally, defendant argues the state "[c]onstructively [d]enied [him] [a]ssistance of [c]ounsel" by not allowing him to sit at the table with his attorney. He also appears to argue his counsel was ineffective for failing to ask that defendant be moved to the defense table. We reject both arguments, since there is nothing in the record indicating that defendant was not present and able to engage with his counsel during the evidentiary hearing. (*Null v. City of Los Angeles, supra*, 206 Cal.App.3d at pp. 1532-1533 [we presume the absence of error from a silent record].) For similar reasons, we decline to consider defendant's apparent argument that the reporter's transcript of the evidentiary hearing is incomplete and inaccurate.

Finally, defendant claims the cumulative effect of errors require reversal. As we have found no error, this argument necessarily fails.

### III. DISPOSITION

The order denying the section 1172.6 petition is affirmed.


/S/ _____
RENNER, Acting P. J.

We concur:



/S/ _____
KRAUSE, J.



/S/ _____
BOULWARE EURIE, J.

16